FILED

2011 DEC 19 P 12: 46

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA, *EX REL.* [UNDER SEAL]

Plaintiff,

v.

[UNDER SEAL]

Defendants.

Civil Action No: 1:09CV 1011 GBL/TRJ

AMENDED COMPLAINT

FILED IN CAMERA AND UNDER SEAL

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA, *EX REL.* WILLIAM JONES,

Plaintiff,

v.

ANIXTER INTERNATIONAL INC.; CORNING INC.; LEGRAND NORTH AMERICA, INC.; CABLOFIL, INC.; ORTRONICS, INC.; THE WIREMOLD COMPANY; NETWORK PRODUCTS INC.; BERK-TEK, A DIVISION OF NEXANS INC.; MARTIN INTERNATIONAL ENCLOSURES, INC., and AMERICAN SYSTEMS CORP.,

Defendants.

Civil Action No: 1:09CV 1011 GBL/TRJ

AMENDED COMPLAINT

FILED IN CAMERA AND UNDER SEAL

1. Plaintiff William Jones, through his attorneys, on behalf of the United States of America, for his Complaint against defendants Anixter International Inc. ("Anixter"), Corning Inc. ("Corning"), Legrand North America, Inc. ("Legrand"), Cablofil, Inc. ("Cablofil"), Ortronics, Inc. ("Ortronics"), the Wiremold Company ("Wiremold"), Berk-Tex, a division of Nexans Inc. ("Berk-Tek"), Network Products Inc. ("NPI"), Martin International Enclosures, Inc. ("Martin"), and American Systems Corp. ("ASC"), alleges, based upon personal knowledge and relevant documents, as follows:

## I. INTRODUCTION

2. This is an action to recover damages and civil penalties on behalf of the United States of America and the States arising from false and/or fraudulent records, statements and claims made, used, presented, and caused to be made, used or presented by defendants Anixter, Corning, Legrand, Cablofil, Ortronics, Wiremold, Berk-Tek, NPI, Martin, and ASC (collectively, "Defendants"), and/or their agents, employees and co-conspirators, in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. ("the FCA").

3. Defendants' conduct described herein violates the FCA. The FCA was originally enacted during the Civil War, and was substantially amended in 1986. Congress amended the statute to enhance the federal government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive, and that the statute, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the United States to disclose that information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

4. The FCA prohibits knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). Additionally, the FCA prohibits knowingly making, using, or causing to be made or used, a false or fraudulent record or statement (a) to get a false or fraudulent claim paid or approved by the federal government (or a government contractor, if the money to pay the claim comes from the government) or (b) to conceal, avoid, or decrease an obligation to pay or transmit money or property to the federal government. 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(G), 3729(b)(2)(A)(ii). Courts have interpreted these provisions to impose liability and penalties upon all claims made under fraudulently-induced contracts. Any person who violates the FCA is liable for a civil penalty of up to $10,000 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(1).

5. The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

6. Based on these provisions, *qui tam* plaintiff and relator William Jones seeks to recover all available damages, civil penalties, and other relief for the violations alleged herein.

7. From some time prior to September 2007 until the present, Defendants, together and separately, in a pervasive fraudulent sales culture, have provided illegal gratuities to government employees and agents in a successful scheme to win lucrative government contracts or to obtain favorable specifications in government contracts, and to exclude competitors from eligibility for those contracts or specifications, and otherwise entered into anti-competitive agreements. These practices subverted regulations governing the competitive bid process for government contracts and violated laws,

regulations, and contract provisions prohibiting the provision of gratuities to government officials to obtain favorable treatment.

8. Defendants' scheme was simple. Over the course of several years, in a concerted and coordinated fraudulent sales culture, Defendants other than Martin plied government employees and agents responsible for the specifications and bidding for the cabling and wiring of CIA facilities, including CIA employee Daniel Faber and his colleagues and subordinates, with repeated unlawful gifts. Martin separately provided Faber and his subordinates with unlawful gifts. The gifts Defendants provided included, among other things, concert tickets, expensive golf and sport-fishing outings, hunting excursions, lodging, prime tickets to NFL and major-league baseball games, NASCAR tickets and VIP NASCAR pit and hot passes, theater tickets, and countless meals and drinks at various bars and restaurants. In addition, at Faber's request, ASC gave a job to Faber's stepson, Matthew Baker, and Anixter's management instructed Jones to give Faber and Baker various unlawful gifts.

9. In exchange for Defendants' gratuities, and contrary to federal regulations, Faber and his team designed the specifications for the cabling and wiring of CIA and other intelligence agency buildings to require the use of Defendants' products. With Faber's encouragement, Defendants even assisted in drafting portions of the specifications. Faber's and Defendants' actions eliminated Defendants' competition and ensured that Defendants' products would be required in the contracts, no matter how much they cost. As a result, Defendants sought and obtained higher prices for their products and services than the government would have paid if bidding were truly competitive, as required by federal laws.

10. Defendants' conduct violates the FCA in at least two ways. First, Defendants fraudulently induced the government to enter into contracts (and, through ASC, subcontracts) for the purchase of Defendants' parts and services by (a) providing illegal gratuities to Faber and his team to obtain favorable treatment; (b) conspiring with

each other and with Faber to rig the specification of contracts to require the use of Defendants' products or to ensure the selection of ASC as prime contractor; and (c) otherwise subverting competition for the contracts at issue, including by entering into anti-competitive agreements. Because the contracts and purchases at issue were fraudulently induced, every claim for payment under the contracts at issue is a false claim subject to liability and penalties.

11. Second, because ASC, and possibly other Defendants, had an affirmative legal obligation to "timely disclose" all credible evidence of the payment of illegal gratuities, the failure to make such a disclosure was a continuing false statement to the government that ASC and/or other Defendants had no knowledge of the illegal gratuities. The government's entry into contracts with ASC, specification of Defendants' products in those contracts, and payment of claims pursuant to those contracts was premised upon Defendants' continuing failure to disclose the payment of illegal gratuities.

12. Defendants' provision of illegal gratuities in exchange for favoritism by government officials was extremely successful. While Anixter, Corning, Legrand, Cablofil, Ortronics, Wiremold, Berk-Tek, Martin, and NPI (collectively, the "supplier Defendants") ordinarily vied with dozens of competitors for sales under both commercial and government contracts, they had no competitors under the CIA contracts for which Faber was responsible. Freed from the constraints of competitive bidding, Defendants were able to charge the government inflated prices for their products and services.

## II. PARTIES

13. William Jones is the Plaintiff/relator in this action (hereafter "Relator") and a resident of Arlington, Virginia. From September 10, 2007 to 2010, Relator was employed by Anixter in its Federal Account outside sales position, which required him to make sales calls and develop business relationships with customers and potential

customers. Relator has direct and independent knowledge of the illegal conduct alleged in this action.

14. Defendant Anixter is a Delaware corporation with its principal place of business in Glenview, Illinois. Anixter is a distributor of communications and security products, electrical and electronic wire and cable, fasteners and other small components, including components used in the United States government projects at issue in this case.

15. Defendant Corning is a New York corporation with its principal place of business in Corning, New York. Through its Corning Cable Systems division, Corning manufactures optical fiber, cable, hardware & equipment for telecommunications networks, including equipment used in the United States government projects at issue in this case.

16. Defendant Legrand is a Delaware corporation with its headquarters and principal place of business in West Hartford, Connecticut. Legrand is the parent company of defendants Cablofil, Ortronics, and Wiremold, which manufacture many of the parts specified and used in the United States government projects at issue in this case.

17. Defendant Cablofil, a wholly-owned subsidiary of Legrand, is a Texas corporation with its principal place of business, on information and belief, in Mascoutah, Illinois. Cablofil manufactures wire cable tray systems, including cable trays specified and used in the United States government projects at issue in this case.

18. Defendant Ortronics, a wholly-owned subsidiary of Legrand, is a Connecticut corporation with its principal place of business in New London, Connecticut. Ortronics manufactures, among other things, fiber-optic and copper cable and cable-related products, including products specified and used in the United States government projects at issue in this case.

19. Defendant Wiremold, a wholly-owned subsidiary of Legrand, is a Connecticut corporation with its principal place of business in Hartford, Connecticut. Wiremold manufactures wire and cable pathway solutions for commercial, institutional,

and residential buildings, including products specified and used in the United States government projects at issue in this case.

20. Defendant Berk-Tek is a division of Nexans Inc., a Delaware corporation with its principal place of business in New Holland, Pennsylvania. Berk-Tek manufactures copper cable, including cable specified and used in the United States government projects at issue in this case.

21. Defendant NPI is a Delaware corporation with its principal place of business in Gaithersburg, Maryland. NPI is the manufacturer's representative for Legrand (including its Cablofil, Ortronics, and Wiremold subsidiaries) and Nexans, Inc. (including its Berk-Tek division, a manufacturer of copper cable specified and used in the United States government projects at issue in this case), representing those companies in sales and business development. At all material times, NPI was the duly authorized agent of Defendants Legrand, Cablofil, Ortronics, Wiremold, and Berk-Tek in their participation in the provision of the illegal gratuities described herein.

22. Defendant Martin is a Massachusetts corporation with its principal place of business in Seabrook, New Hampshire. Martin manufactures enclosures used to house electronic equipment, including cabinets used for electronics associated with the wiring of the United States government projects at issue in this case.

23. Defendant ASC is a Virginia corporation with its principal place of business in Chantilly, Virginia. It provides systems engineering, technical, and managed services to government customers, including services under United States government contracts at issue in this case.

## III. JURISDICTION AND VENUE

24. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 and 3730.

Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

25. This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the defendants have minimum contacts with the United States. Moreover, the defendants can be found, reside, or transact or have transacted business in the Eastern District of Virginia.

26. Venue is proper in the Eastern District of Virginia pursuant to 31 U.S.C. § 3732(a) because the defendants can be found in and transact or have transacted business in this district. At all times relevant to this Complaint, defendants regularly conducted substantial business within this district and made significant sales within this district, and Anixter and ASC maintained employees in this district. In addition, statutory violations, as alleged herein, occurred in this district.

## IV. DEFENDANTS VIOLATED THE FALSE CLAIMS ACT BY PROVIDING GRATUITIES TO A GOVERNMENT OFFICIAL FOR FAVORITISM AND BY COLLUDING TO ELIMINATE COMPETITION

27. To ensure the integrity of its acquisition and contracting processes, the United States enacted certain provisions of the Federal Acquisition Regulation (the "FAR"), codified in Title 48 of the Code of Federal Regulations.

28. The government requires that the contractors with whom it does business "conduct themselves with the highest degree of integrity and honesty." 48 C.F.R. § 3.1002. One explicit – and obvious – component of that requirement is that government contractors must not provide bribes or illegal gratuities to government officials in order to secure favorable treatment.

29. It is a crime for any person to give, or to promise to give, "anything of value to any public official" – including "an officer or employee or person acting for or on behalf of the United States, or any department, agency, or branch of Government

thereof" – with "intent … to influence any official act …" or "because of any official act performed or to be performed" by the public official. 18 U.S.C. § 201. The FAR incorporates this prohibition into all government contracts worth more than $5 million and with a duration of longer than 120 days in at least three ways:

30. First, as a result of a regulation enacted in November 2008, each such contract must contain a clause providing that:

> The Contractor shall timely disclose, in writing, to the agency Office of the Inspector General, with a copy to the Contracting Officer, whenever, in connection with the award, performance, or closeout of this contract or any subcontract thereunder, the Contractor has credible evidence that a principal, employee, agent, or subcontractor of the Contractor has committed – (A) a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (B) A violation of the civil False Claims Act ….

48 C.F.R. § 3.1003(a); 48 C.F.R. § 52.203-13(b)(3)(i). The contractor also must "include the substance of this clause … in subcontracts that have a value in excess of $5,000,000 and a performance period of more than 120 days." 48 C.F.R. § 3.1003(a); 48 C.F.R. § 52.203-13(d).

31. Second, each such contract must contain a clause permitting the government to terminate the contract if the contractor "(1) Offered or gave a gratuity (*e.g.*, an entertainment or gift) to an officer, official, or employee of the Government; and (2) Intended, by the gratuity, to obtain a contract or favorable treatment under a contract." 48 C.F.R. § 3.202, 48 C.F.R. § 52.203-3. This provision has been required in government contracts above the $5,000,000/120-day threshold since 1996.

32. Third, the FAR provides that, irrespective of the inclusion in the applicable contract of the clause described in paragraph 30, the government may suspend or disbar a contractor for the "knowing failure by a principal to timely disclose to the

Government ... credible evidence of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States code or a violation of the civil False Claims Act." 48 C.F.R. § 3.1001 (relevant portion effective November 12, 2008).

33. Laws and clauses required to be included in government contracts also prohibit the payment of money or gratuities to prime contractors for the purpose of obtaining or rewarding favorable treatment in connection with a government prime contract. 41 U.S.C. § 52-53; 48 C.F.R. §§ 3.502-3, 52.203-7.

34. Together, these provisions render compliance with anti-bribery and anti-gratuity laws an explicit condition of participation in government contracts. Moreover, contractors have a continuing affirmative obligation, founded in both regulatory and contract provisions, to "timely disclose" all "credible evidence" of the payment of illegal gratuities. The failure to make disclosure of "credible evidence" of the payment of illegal gratuities constitutes a continuing false statement that the contractor has no knowledge of the payment of such gratuities to government officials. Defendants knowingly failed to make such disclosures to obtain the contracts at issue initially and later to induce the government to pay claims.

35. In addition, the government's policy is "that contracting officers shall promote and provide for full and open competition in soliciting offers and awarding Government contractors." 48 C.F.R. § 6.101. The FCA imposes liability and penalties on all claims submitted under government contracts that were fraudulently induced, including by payment of illegal gratuities or schemes to subvert competition in contract bidding.

## V. FACTUAL ALLEGATIONS

### A. Defendants Plied CIA Employees and Representatives with Junkets, Entertainment, Meals, and Alcohol

36. Because of its close relationships (which Anixter describes as a "partnership") with Corning, Legrand (including Legrand's subsidiaries), and Berk-Tek, Anixter receives "price protection" from those manufacturers, giving it a right to a much better price on Corning, Legrand, and Berk-Tek products than other distributors. This "price protection" enables Anixter to take a substantial markup on products made by those manufacturers without encountering any price competition, thus ensuring significant profits on those products. In addition, Anixter has strategic partnerships with ASC, as described more fully below. As a result, Defendants have a joint and common interest in working together to secure contracts and specifications for the use of their products and services in government contracts, including the contracts at issue in this case.

37. Daniel Faber is a CIA employee and Program Director for the "Falcon" and "Buckeye" programs, the code-names for intelligence agency building projects. In that capacity, he is responsible for IT specification and design for several buildings which have been and are being constructed for United States government intelligence agencies, and is involved in IT procurement for those buildings. The Falcon program covered certain buildings (including one CIA building), and expired in 2008. The Buckeye program commenced in March 2009 and covers all cable and wiring installation for another CIA building (referred to herein as "CIA Building 2"), MS2, and certain other buildings for the next five years.

38. A team of support staff reports or reported to Faber on the Falcon and Buckeye programs, including Mike Current, Kathy Williams (the Deputy Falcon Program Manager), Keith Evans (the MS2 Project Manager), Randall ("Randy") Sherwood (the CIA Building 2 Project Manager), Wendi Wesberry (Senior Systems Integrator –

Network Requirements), Brooke Gross (Systems Integrator and Schedule Management), Teresa Smoot (Systems Integrator – Network Requirements), Doug Berry (an architect), and Carlton Suber (a LAN engineer). Some of Faber's Falcon and Buckeye team were CIA employees; others were employees of private contractors under contract to the government. Each, however, was a "public official" under the terms of the bribery statute, *i.e.*, an "an officer or employee or person acting for or on behalf of the United States, or any department, agency, or branch of Government thereof." 18 U.S.C. § 201.

39. Since at least September 2007, and for some time prior to that, Defendants have engaged in a regular practice of providing illegal gratuities to Daniel Faber and members of his Falcon and Buckeye teams (including, without limitation, Mike Current, Keith Evans, Randall Sherwood, Wendi Wesberry, Brooke Gross, Doug Berry, and Teresa Smoot), and to another CIA employee, Chris Matelski, for the purpose of currying favor and influence in the specifying and awarding of government contracts.

40. Relator began working for Anixter in September 2007 as its Federal Account outside sales person. He replaced Bill Hobbs in that position when Hobbs was promoted to Anixter District Manager, US Federal and Commercial Mid-Atlantic. For approximately four years, Hobbs had been the Anixter salesman responsible for Anixter's relationship with Faber and the Falcon program. Prior to joining Anixter, Hobbs worked for Corning for five years, where, as Federal Account Sales Engineer, he was responsible for Corning's relationship with Faber. When Relator joined Anixter, he was given the CIA and other intelligence agency end-user accounts under Hobbs' supervision, but Hobbs remained in charge of and heavily involved in the Falcon and Buckeye programs and the Faber relationship, as well as other programs and relationships. Hobbs continues to be in charge of negotiating the "price protection" alleged in paragraph 34 hereof.

41. Only a month after joining Anixter, Relator attended a junket to Connecticut with Faber, Current, Evans, and Sherwood, along with Hobbs, NPI's Jon Mengenhauser, and various employees of Legrand and its subsidiaries. The ostensible

purpose of the trip was to visit Legrand's facilities. In fact, however, the corporate visit took only a few hours. For the remainder of the three-day trip, Defendants entertained Faber, Current, Evans and Sherwood. Defendants paid for meals, drinks, and chartered fishing boats. Faber and his team paid for nothing and offered to pay for nothing. After the trip, Mengenhauser joked with Faber via email that he was "glad we could broaden your culinary horizons on the trip."

42. Jimi Barker, Corning's Sales Manager, Private Networks Federal Government Solutions, later explained to Relator the reasons for the lavish entertainment for Faber and his team. When Relator asked Barker why Defendants spent so much money on Faber, Barker responded, "That's how we get and keep the business. You've got to spend money to make money." Thus, as Mengenhauser advised Relator, "Treat [Faber] like a king. Whatever Dan wants, Dan gets." Keith Evans, a member of Faber's team, told Relator that to get government work, "you have to have a champion in the government, like Dan, because he is on the board or committee that makes the decisions." Not surprisingly, Hobbs told Relator that he had been entertaining Faber for years – indicating that Defendants' practice of providing gratuities to Faber and his team in exchange for favorable treatment had been ongoing throughout the Falcon program.

43. Throughout the last several years, Defendants' practice of providing gratuities to Faber and his team was simply a daily part of doing business. For example, those gratuities included, but were not limited to, the following:

| Date | Description | Public Official Recipient |
|---|---|---|
| Unknown (before October 2007) | Cubs baseball game in Chicago | Daniel Faber |
| Unknown (before October 2007) | NASCAR event in Chicago | Daniel Faber |
| Unknown | Thirteen trips to Boston or New Hampshire, ostensibly to visit Martin's facilities. Trips included tickets to two Red Sox games and | Daniel Faber, unknown |

| Date | Description | Public Official Recipient |
|---|---|---|
| | one outing for Faber's entire team at a Blue Man Group show. | |
| October 16-18, 2007 | Chartered fishing trip, meals, and alcohol during three-day trip to Connecticut for visit to Legrand (and subsidiaries') facilities | Daniel Faber, Mike Current, Keith Evans, Randy Sherwood |
| November 16, 2007 | Deer hunt | Randy Sherwood |
| December 4-6, 2007 | Meals and entertainment during trip to Texas and Mexico for 3-4 hour Corning plant tour | Daniel Faber, Mike Current |
| December 14-15, 2007 | Pheasant shoot and guided deer hunt | Keith Evans |
| February 8, 2008 | Dinner and drinks at Red Hot & Blue and tickets to Blue Man Group concert | Daniel Faber, wife, and son |
| March 24, 2008 | Wedding and baby gift | Daniel Faber's stepson |
| April 2, 2008 | Corning happy hour at Grand Slam Sports Bar; NPI/Anixter happy hour at Gordon Biersch Brewery Restaurant | Daniel Faber; Wendi Wesberry |
| April 13, 2008 | Tickets to Washington Nationals baseball game | Brooke Gross and family |
| May 4, 2008 | Tickets to Washington Nationals game | Daniel Faber and sons |
| May 21, 2008 | Tickets and expenses for Washington Nationals game | Randy Sherwood and family |
| June 3-5, 2008 | Alcohol, golf, clothes, and meals on Myrtle Beach junket for short Corning plant tour | Wendi Wesberry, Randy Sherwood, Daniel Faber |
| June 8, 2008 | Tickets to Washington Nationals game | Daniel Faber and family |
| July 10, 2008 | Corning and Anixter happy hour at Clarendon Ballroom | Randy Sherwood, Wendi Wesberry, Daniel Faber Doug Berry, Teresa |

| Date | Description | Public Official Recipient |
|---|---|---|
| | | Smoot |
| July 31, 2008 | Meal and golf expenses at Raspberry Falls and Centerplate | Wendi Wesberry |
| August 6-11, 2008 | NASCAR tickets and VIP pit and hot passes, golf, meals, alcohol, admission to clubs (including strip clubs), local transportation and transportation to Canada, and use of Anixter executive's lake house during six-day trip to Corning, New York for one-hour plant tour | Daniel Faber, Randy Sherwood |
| August 2008 | Corning "LAN 500" training in Phoenix, Arizona. Relator believes that Faber chose for his team to attend this training in Phoenix for golf and entertainment purposes, even though Corning offered the same training in northern Virginia (near Dulles Airport) and Annapolis, Maryland – both near where Faber lives and works – within a few months of the Phoenix training. | Daniel Faber, Wendy Wesberry, Randy Sherwood |
| September 2008 | Washington Nationals baseball tickets | Wendi Wesberry and family |
| December 7, 2008 | Tickets to Washington Redskins-Baltimore Ravens football game ($829.00) | Wendi Wesberry and family |
| May 29, 2009 | Golf outing with Josh Sharpe, Corning | Daniel Faber, Chris Matelski, Wendi Wesberry |
| June 2009 | Golf at Cintelco tournament (two foursomes, including Faber's, purchased by Anixter executives) | Daniel Faber |
| Summer 2009 | Dinners, drinks, and entertainment for visit to Berk-Tek facilities in Pennsylvania, arranged by Jon Mengenghauser of NPI | Daniel Faber |

| Date | Description | Public Official Recipient |
|---|---|---|
| August 31 - September 5, 2009 | Entertainment, meals, drinks, and transportation (including limousine ride) on trip to Wilmington, North Carolina and Myrtle Beach, South Carolina, ostensibly for visits to Corning plants. Included golf with ASC and Corning at Catawba Country Club in Newton, North Carolina. | Daniel Faber, Chris Matelski |
| September 28 - October 2, 2009 | Trip to Reynosa, Mexico and South Padre Island, Texas. The trip was ostensibly for a short (few-hour) visit to Corning's facility in Mexico (there was not even a business pretext for the visit to South Padre Island, which caused the group to extend the trip by two days), but Corning's Jeff Jones stated that "my liver can't handle [a longer trip]," meaning that the trip's real purpose was for drinking. | Daniel Faber, Robert (last name unknown – representative of tenant of government building) |
| January 17-20, 2010 | Golf (January 17, 19, and 20) and possibly meals and drinks with Corning and NPI at BICSI conference | Daniel Faber |

For Washington Nationals games, Faber's team simply selected games they would like to attend off of a schedule that Anixter provided Faber. They could use all of the tickets themselves or invite Anixter or Corning employees if they wanted someone to pay for their food and drinks. In addition to the foregoing, there were many other instances of illegal gratuities offered to Faber and the other government employees and agents.

44. There is no legitimate government business purpose for Defendants' gifts of baseball, football, NASCAR, and theater tickets, golf or hunting outings, nights of drinking, or any of the other illegal gratuities given to Faber, the other government employees and agents, and their families. Even the ostensible business purposes for

many of the junkets described above – short plant visits in the middle of several-day trips – were of no value to the government. The government does not need, and Faber and his team do not have the competence, to inspect the manufacturing facilities for common commercial products. Instead, those plant visits were simply pretexts, concocted by Defendants at Faber's urging, to treat Faber and his team to several days – and thousands of dollars' worth – of sporting events, golf, meals, and extensive carousing. Moreover, Faber's repeat visits to many of his favored destinations – including Corning facilities in Mexico and near Myrtle Beach, South Carolina – are not merely pointless, but also redundant. Even if there were some value to the government in visits to Corning's manufacturing plants to see cable being made (and there is not), it would make no sense to visit multiple facilities to see the same manufacturing processes, year after year.

45. In addition to the above events, Defendants paid for scores of meals, drinks, and snacks for Faber and his team at numerous restaurants, bars, and coffee shops, including Hooters (Faber's preference for Hooters was so strong that Cablofil named a component, the "HTRS cable tray," after it), Famous Dave's, and Starbucks, often spending hundreds of dollars on meals and alcohol. Corning's Josh Sharpe also took another government official with responsibilities with respect to another building being built deep-sea fishing and golfing at North Carolina's Outer Banks. Whenever Defendants' representatives were present – whether at a bar, restaurant, sporting event, or coffee shop – Faber's team expected Defendants to pick up the check and never offered to do so themselves.

46. In January 2009, Faber sent an email to ASC's David Gay, Anixter's Hobbs and Jones, and Wesberry (who works for the government under a contract with Tenacity Solutions Incorporated, a private contractor), attempting to secure a job for his stepson, Matthew Baker, with one of those companies whose government business he controlled: "I was curious if any of you had any positions which require immediate filling!!! ... Dave - do you need any installers? Bill/Will - Inside sales or warehouse?

Wendi - Can Tenacity use anyone NOT cleared?" To cement its relationship with Faber, ASC hired Baker as an installer. Baker worked for ASC on CIA Building 2, installing cable under the contract that his stepfather supervised.

47. Anixter's practice of providing Faber and his team with gratuities, both lavish and mundane, continued until July 2009, when Relator, whose prior complaints to superiors went unheeded, escalated his concerns to Anixter's General Counsel and Vice President – Internal Audit. The remaining Defendants have continued to provide illegal gratuities to Faber, his team, and other public officials.

48. For example, ASC and Corning sponsored a lavish "boondoggle" (as Faber describes it) to Hickory, North Carolina and Myrtle Beach, South Carolina for August 31 through September 5, 2009. Faber and Chris Matelski (a high-ranking CIA employee and head of IT for "Sparta," the code name for a planned tenant of one of the Buckeye buildings, and a client that "requires its own fiber infrastructure," according to Faber) flew, at government expense, to Hickory. There, they joined David Gay (ASC's Vice President, Special Projects Directorate), Joe Hempstead (ASC's Vice President and Project Manager), Barker, Jeff Jones (Corning's Account Manager, Federal Networks Sales – East) and Josh Sharpe (a Corning Sales Engineer). The group took a short tour of Corning's plant, followed by dinner, drinks, and entertainment with other senior Corning management at Corning and ASC's expense. The next morning (September 1), Corning provided transportation to Myrtle Beach, where the group stayed, even though the ostensible business purpose of their trip was a visit to Corning's Wilmington, North Carolina plant, over 70 miles away. Although the plant visit took only an hour or two (plus three hours of driving), the group stayed in Myrtle Beach from September 1 until the morning of September 5 for golf, meals, drinking, limousine rides, entertainment, and karaoke (Faber even complained, before the trip, that the group's size – seven attendees – was one too few for golf foursomes). Faber and Matelski originally planned to fly back to Washington, D.C. on Friday, September 4, but decided to stay until September 5 after

Jeff Jones promised to "find some kind of trouble to get into" on Friday night. Other than Faber and Matelski's flights and lodging (for which the government paid or will pay, despite the lack of any valid governmental purpose for the trips), Defendant Corning paid for all of Faber and Matelski's expenses on these trips.

49. The gratuities described above, and others, were paid or offered by Defendants. Even in instances in which one Defendant allowed other Defendants to provide illegal gratuities (rather than paying for the event itself), each Defendant other than Martin was aware of and supported the payment of these illegal gratuities, having been invited to and/or having attended functions at which the gratuities were given. Further, defendant ASC is aware that it is subcontracting to Anixter, Legrand (and its subsidiaries), Corning, and Berk-Tek in sole source contracts and that ASC's and the supplier Defendants' participation in illegal gratuities has the effect of steering contracts to ASC. As a result, ASC is aware of the fact that it is benefitting from the illegal entertainment and gratuities provided to Faber by the supplier defendants. Indeed, the provision of gratuities to Faber and his team is a concerted scheme intended by each Defendant other than Martin to benefit all of them jointly by obtaining contracts, subcontracts, and specifications through those gratuities.

50. The CIA is not the only government victim of Defendants' illegal gratuity scheme. Relator is informed and believes, on the basis of information provided by Lisa Boynton, an Anixter Federal End User outside sales person, that Anixter has provided gratuities (including meals and golf outings) to other public officials. Boynton has made substantial sales on Anixter's behalf to the Pentagon, the State Department, the United States Marine Corps, the Department of Justice, the FBI, the Postal Service, Immigration and Customs Enforcement, and the Social Security Administration. She has stated to Relator that it was her regular practice to provide gratuities (*e.g.*, meals), on Anixter's behalf, to public officials responsible for those government agencies' projects, and that Anixter's new policy prohibiting such gratuities endangered her ability to generate sales.

In addition, Hobbs has provided illegal gratuities in an unsuccessful attempt to obtain government contracts in connection with a building for the National Geospatial Agency.

**B. CIA Employees and Representatives Rewarded Defendants' Generosity by Specifying their Products and Eliminating Competition**

51. Faber and his team rewarded Defendants for their gratuities by subverting the competitive bid process for the Falcon and Buckeye programs and allowing Defendants to participate in the drafting of project specifications that specified Defendants' own products.

52. In November and December 2007 – shortly before and after Faber and Current's trip to Texas and Mexico with Anixter and Corning personnel – Faber provided information about the upcoming CIA Building 2 facility (part of the Buckeye program) to NPI's Jon Mengenhauser and Relator so that Defendants could begin to suggest portions of the bid package that would specify Defendants' products. As Defendants began work on writing their own products into the Buckeye specifications, Faber expressly tied the project to another suggested junket, writing in an email that "We will work with you as needed to get your folks up to speed on how we do what we do. It may mean a trip or two up to Connecticut. DAMN the bad luck!!!" As described above, Defendants understood that their continuing satisfaction of Faber's appetite for junkets, meals, drinks, and entertainment was "how we get and keep the business."

53. Mengenhauser coordinated employees of Legrand (including its subsidiaries) and Berk-Tek in drafting specifications that included products those companies manufactured (and Anixter distributed), keeping Faber apprised of progress and requesting assistance from Faber and his team. This scheme allowed Defendants both to influence directly the development of the specifications and to obtain notice of the government's needs well in advance of any potential competitors. Defendants' requests for government information to help write the specifications occasionally were coupled with offers for perks. In a December 13, 2007 email, for example, Mengenhauser

requested a technical meeting about the CIA Building 2 facility at Anixter's offices and proposed that "After the meeting we should all set out to a local spot for some food and refreshments."

54. In late December 2007, Faber sent NPI an email formally informing it of the successor to the Falcon program (which would later be called Buckeye). Faber's email was a mere formality, since NPI had already been coordinating the drafting of specifications for the Buckeye program for a month. Although there were a wide range of commercially available substitutes for Legrand's and Berk-Tek's products, Faber's December 2007 email stated that the project's standards would continue to require boxes, fittings, and cables manufactured by Wiremold and Ortronics, two Legrand subsidiaries (ultimately, the finalized specifications also required Corning, Cablofil and Berk-Tek products). Faber asked NPI to "provide me a list of contractor organizations which have an ongoing and continued valued relationship within the [Washington metro area]. The contractor organization FALCON would like to work with is one which Wiremold, Ortronics and Berktek can stand behind and certify that the products installed meet all their installation specifications." In short, Faber asked NPI to identify the contractor that NPI and Legrand would like to win the contract. In a follow-up email, Mengenhauser wrote to Anixter that "we should discuss what [Certified Installer Program Contractors] we can recommend to Dan that are Anixter and NPI friendly. I will not send him any recommendations until we agree who should be proposed! I would bet Jimmy [Barker] got the same email for Corning EWPs."

55. In January 2008, Faber wrote to NPI, "Are you sitting down!? ... Please do ... and don't be driving while reading this!! ... It is the intent of the [government] to release a bidders package for the CIA Building 2 base building near the end of February .... My recommendation is, put together a spec, mark it draft or subject to change, and let it be our two boxes [components for the project]. Your groups will be receiving the phone calls from various contractors who want to bid the base building." In other words,

Faber asked NPI (Legrand's agent) to draft a specification that would require bidders to use Legrand's products in the Buckeye program.

56. Mengenhauser assured Anixter on January 2, 2008, that the specifications would benefit Anixter as well, writing to Hobbs and Relator that "I have the [Wiremold] and Cablofil guys getting organized. We'll spec in part numbers that are unique to you!" On January 17, 2008, Mengenhauser confirmed that "The Wiremold part numbers are [CIA Building 2]/Anixter specific. So your interests are covered!"

57. In late January, TOLK, an electrical contractor, sought to include in the CIA Building 2 specifications approval to use products manufactured by GS Metals, a competitor of Cablofil's. TOLK did not want to have only a single manufacturer approved in the specification. Because of his close relationship with NPI and Legrand, however – a result of the gratuities described above – Faber resisted. According to Mengenhauser, Faber "prevailed! The spec will read Cablofil (only) or approved equal but no equivalent listed." Even though the specifications permitted use of an "approved equal," any such approval would have to come from Faber, and Mengenhauser was confident that no such approval would occur: "We know Dan and his guys will back us if the EC's [electrical contractors] try and pull a substitute. [Cablofil's] HTRS part numbers are in the spec."

58. In April 2008, after thanking Mengenhauser for NPI's happy hour at the Federal Office Systems Exposition conference, Faber asked for the status of Cablofil's HTRS cable tray layouts. Faber stated that Doug Berry, the government's architect, had "prepared what he believes would work, but I would also like to see what Cablofil has created." Faber coupled this with a suggestion that he and Berry meet with Cablofil's personnel at Cablofil's St. Louis offices. Cablofil agreed, offering that "something to plan your trip around is a [St. Louis] Cardinal game? Just a thought since you've got that nice Cardinal cap."

59. Upon seeing Cablofil's draft of a preliminary bill of materials for the CIA Building 2 building, Mengenhauser commented, "Nice $$!"

60. Faber's team adopted the specifications that Defendants drafted, and included them in a request for bids for the installation of cable and wiring for the Buckeye program. At an October 27, 2008, bidder's conference for the Buckeye project, the government presented an Informational Briefing requiring the use of several Cablofil, Ortronics, and Corning parts identified by brand name (and frequently by Anixter kit part number, a designation that would be utterly inscrutable to competitors), even though there were numerous commercially available substitutes for those products. As Faber had advised in his January 2008 email, the installation contractor would be responsible for purchasing products from Defendants for use in the project.

61. Relator expected to see numerous competing bidding teams at the October 27, 2008 bidder's conference, and was surprised that the only portion of the project for which there were competing bidders was the installation contractor. There were no other suppliers of parts that could be used as alternatives to the parts manufactured or distributed by Anixter, Corning, Legrand (including its subsidiaries), or Nexans/Berk-Tek. When Relator expressed his surprise to Hobbs, Hobbs said, "now you understand how this all fits together."

62. Relator is informed and believes that Verizon Federal was the low bidder for the installation contract, but that Faber used his influence to award the contract to ASC, the installation contractor most friendly to the supplier Defendants, and one who was well aware of and participated in the illegal gratuities and employed Faber's stepson at Faber's request. Because components manufactured, represented, or distributed by Anixter, Corning, Legrand, Cablofil, Ortronics, Wiremold, Berk-Tek, and NPI are specified in the contract, thus eliminating competition among suppliers for those components, the supplier Defendants are able to charge higher prices for those components than if there were true competition. Anixter's average margin on the

products at issue in the Falcon and Buckeye projects, for example, is approximately 22%, compared with a 7-13% average margin on products it sells on competitive commercial projects. ASC benefits from this arrangement because increased base price for the Corning and Legrand components allows ASC to take a greater real-dollar markup on those components, even though the fixed percentage of its markup may not change. In addition, because ASC charges for its installation labor as a percentage of the price of materials, the inflated price of the materials resulting from the Defendants scheme, enables ASC to inflate its installation labor charges as well.

63. On information and belief, Relator alleges that Defendants obtained contracts, subcontracts, and specifications on prior building projects under the Falcon project pursuant to the same scheme.

64. The scheme among the Defendants is self-reinforcing. The Defendants receive contracts because of the illegal entertainment and gratuities. As a result of increased volume of purchases from Corning and Legrand, Anixter obtains more "price protection" from them and, thereby, is able to undercut competition and/or increase its margins. Then, this increased "price protection" enables Anixter to offer more lavish illegal entertainment and gratuities, resulting in additional contracts, and so on, all to the benefit of the Defendants (other than Martin) and to the detriment of the government. This cycle is even written into Anixter's corporate "Blue Book" manual: "We entertain first-class, always. To do this, we must have first-class profit." As Mengenhauser told Relator, "thank goodness for the US government and the American taxpayer."

65. Defendants also have entered into certain agreements amplifying the anticompetitive nature of their conduct. First, Anixter has facilitated an agreement between Corning and Ortronics to limit their competition for government contracts. Corning and Ortronics are competitors in the manufacturing of fiber-optic cable (one of the goods used in the Falcon and Buckeye projects). Hobbs told Relator that he has had discussions with both Corning and Ortronics, emphasizing to them, "this is your piece [of

the business]; don't get greedy," and warning them not to compete for more than their respective "pieces" of the Falcon and Buckeye business, as divided by Defendants. Similarly, because it benefits from the exclusivity Faber grants for its Legrand and Berk-Tek products, NPI does not seek to upset Faber by competing to include cabinets that it represents in the Falcon/Buckeye specifications – Faber already has designated Martin as the sole electronics cabinet supplier under those programs. NPI does not press the issue even though NPI's Mengenhauser believes that the cabinets NPI represents are higher-quality and sell for a lower price than Martin's cabinets. Second, Relator is informed and believes that ASC and Anixter have entered into an agreement whereby ASC agreed to buy the contract-specified materials exclusively through Anixter if it won the Falcon and Buckeye products (and would support the specification of favored products that Anixter distributes), and Anixter agreed that, to help ASC win the contract, it would not offer any competing contractor better prices than it offered to ASC. These agreements are illegal agreements in restraint of trade and interstate commerce and actually resulted in a reduction in competition, and a corresponding increase in price, for the materials required by the Falcon and Buckeye programs.

### C. Anixter Retaliated Against Relator for Complaining about Illegal Gratuities

66. After Relator's surprise at the lack of competition at the October 2008 bidders' conference, Relator expressed concern to his superior, Hobbs, that Anixter's entertainment of Faber and his team resulted in favoritism from the government and, therefore, was illegal. Hobbs dismissed this concern and instructed Relator to continue to entertain Faber at Anixter's expense.

67. When Relator refused to do so, Anixter retaliated. Hobbs attempted to cut off Relator's contact with Faber. Although Relator officially remained the Falcon/Buckeye programs' point of contact at Anixter, Anixter simply stopped providing Relator with information about those programs. Relator was so completely isolated from

contact with Faber's projects that Faber complained to Relator's superiors that Relator was unaware both of the programs' orders with Anixter and of upcoming junkets to Connecticut, Hickory, North Carolina, Myrtle Beach, South Carolina, and Mexico.

68. Hobbs and his supervisor, Anixter Regional Vice President Sam Gilson, also retaliated by impeding Relator's ability to build relationships with other federal customers. Gilson stopped inviting Relator on trips with customers and potential customers, and Hobbs and Gilson excluded Relator from the largest contracts within his area of responsibility.

69. In December 2008, Hobbs showed up uninvited at Relator's house, late on a Saturday night, to argue about Relator's complaints of Anixter's illegal behavior. Hobbs told Relator, "You'd better keep your mouth shut and do what you're told."

70. In February or March, 2009, Hobbs presented Relator with a new compensation agreement, which reduced Relator's potential bonus (which had already been earned at that point) from $100,000 to $18,000. When Relator asked why his compensation package was being changed, Hobbs said, "You've gotten off the reservation. This is your contract; take it or leave it."

71. In May 2009, Hobbs instructed Relator to obtain major-league baseball tickets for Faber and his family for several games. Relator refused and complained to Gilson. Gilson acknowledged that Anixter's conduct was not legally permissible, but told Relator that "that was the way business was done," and that he would have to provide Faber with the baseball tickets "if you want to play for this team."

72. In a Quarterly Business Review in June, Gilson and Hobbs informed Relator that he was failing to meet his sales goals, even though they knew that, as a result of the categorization of certain sales under the Falcon and Buckeye projects (the categorization Gilson and Hobbs were using for their own performance evaluations and bonus calculations), he was far exceeding his sales goals. Gilson and Hobbs used their miscalculation of Relator's sales numbers to pressure Relator, unsuccessfully, to resign.

73. In early July 2009, after Hobbs and Gilson continued to exclude Relator from contact with his most important customers and potential customers, Relator complained in writing to John Dul, Anixter's General Counsel, and Nancy Ross, Anixter's Vice President – Internal Audit, with copies to Hobbs and Gilson. Only in late July 2009, after receiving Relator's written complaint, did Anixter agree that Relator should not pay for Faber's meals or entertainment. The remaining defendants appeared to continue their practice of scheduling junkets to entertain Faber and his team, including the junkets and golf outings described above.

74. After July 2009, Relator occasionally sought clarification from his superiors of Anixter's gratuities policies in specific circumstances (*e.g.*, whether it is permissible to provide meals or entertainment to prime contractors for the government). Gilson repeatedly refused to provide clarification, instead instructing Relator to use his own judgment and telling Relator that "it is not feasible for us to consider and investigate the legality of all potential scenarios."

75. In February 2010, Relator contacted John Dul (Anixter's General Counsel, to whom Relator had directed his written complaint of retaliation in July 2009), asking why he had never received any response to it or any relief from Hobbs' and Gilson's retaliation. Dul told Relator that the investigation had taken longer than anticipated but that it would be completed in a few weeks, and that Relator would be contacted by one of Anixter's in-house human relations personnel. Instead, Realtor's attorney was contacted by Cathy Murnane, one of Anixter's in-house employment lawyers. Ms. Murnane said that she did not know what Relator wanted - "a new boss, a new location or 'to get the Hell out of there.'" Relator's attorney responded by saying that Relator's real desire was to continue his employment in a work environment which did not include illegal gratuities or retaliation. Ms. Murnane replied that she did not see continued employment as a possibility. Thereafter, the parties negotiated an agreement settling Relator's

potential employment claims, under which, among other things, Relator complied with Anixter's demand that he resign.

76. Anixter's conduct in demanding Relator's resignation (instead of terminating the employees who were at fault for the illegal actions which Relator exposed), together with its improper and illegal withholding of compensation due and its attempts to coerce Relator to release claims under the False Claims Act, are further examples of illegal retaliation by Anixter against Relator.

**D. <u>Defendants' Conduct Violated the False Claims Act</u>**

77. The Conduct described above violated the False Claims Act in at least two ways.

78. First, Defendants' conduct fraudulently induced government contracts and subcontracts, including contracts and subcontracts under the Falcon and Buckeye programs. Defendants other than Martin partnered together to use junkets, golf and hunting outings, entertainment, meals, and drinks to buy influence and favoritism from Daniel Faber and other public officials; Martin provided such gratuities to Faber on its own, for the same reasons. As a direct result, Faber enabled Defendants to write their own products into specifications under the Falcon and Buckeye programs and otherwise exercised his influence to steer contracts and specifications under the Falcon and Buckeye programs to his benefactors. In addition, Defendants other than Martin agreed to work as a team to obtain Falcon and Buckeye contracts and specifications, dividing up areas where they should have competed and pledging to support other Defendants to the exclusion of competitors and at the expense of fair competition.

79. Second, Defendants failed to "timely disclose," as explicitly required by law and, on information and belief, by contract, their knowledge of "credible evidence" of the payment of illegal gratuities to public officials. Had Defendants disclosed that they obtained specifications and contracts through the provision of those illegal gratuities,

they would never have been awarded the contracts and specifications in the first place. Defendants' failure to make the required "timely disclosure" was, in effect, a continuing false statement that they had no knowledge of the payment of illegal gratuities, made for the purpose of enabling Defendants to obtain and receive payment on government contracts and subcontracts.

80. Defendants used the above-described conduct to obtain contracts, subcontracts, and specifications under the Falcon program from some time prior to September 2007 until early 2009. They used the above-described conduct to obtain contracts, subcontracts, and specifications under the Buckeye program from early 2009 until the present. The Buckeye program is set to last until 2014, and Defendants are continuing to seek further contracts, subcontracts, and specifications under that program.

81. Defendants knew, or recklessly disregarded, that their conduct was fraudulent. The prohibition on gratuities to public officials is stated clearly and repeatedly in the United States Code, the Code of Federal Regulations, and, on information and belief, in the contracts at issue in this case. As contractors with substantial government business (and with numerous sales and management positions dedicated to sales to the federal government), Defendants knew that the law prohibited them from buying government influence and favoritism with entertainment, meals, and drinks.

82. Through their conduct and agreements, which are intended to and do eliminate competition for the contracts, subcontracts, and specifications at issue, Defendants were able to charge higher prices for their goods and services under the Falcon and Buckeye programs than the government would have paid if the bidding and specification process were conducted in a fair and competitive manner.

## VI. STATEMENT OF CLAIMS

**Violation of Federal False Claims Act**

31 U.S.C. §§ 3729(a)(1)(A)-(C), (G)

(Against All Defendants)

83. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 82 of this Complaint.

84. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

85. As a result of the above-described conduct, including the payment of illegal gratuities and the subversion of the competitive bid process and restraint of trade and interstate commerce, ASC's contracts with the government under the Falcon/Buckeye programs, the subcontracts under Falcon and Buckeye prime contracts for the purchase of Defendants' products, and the specification under the Falcon and Buckeye projects of products that Defendants manufacture, represent, or distribute, were induced by fraud.

86. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the United States government for payment or approval, and/or presented false or fraudulent claims to contractors, grantees, or other recipients seeking payment of money provided by the United States government or to be reimbursed by the United States government to be spent or used on the government's behalf or to advance a government program or interest.

87. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, material to false and fraudulent claims.

88. By virtue of the acts described above, including their failure timely to disclose to the Government all evidence of violations of bribery and gratuities laws as

required by regulation and contract, Defendants knowingly concealed or knowingly and improperly avoided obligations to pay or transmit money or property to the Government.

89. Each claim Defendants submitted, whether to the United States or to a contractor, under each contract with respect to which Daniel Faber had any responsibility constituted a false claim. Each such claim was tainted by Defendants fraudulent provision of illegal gratuities and collusion with Daniel Faber to eliminate competition and to restrain trade and interstate commerce. Additionally, each statement Defendants made to the government that failed to timely discharge their affirmative obligation to disclose known credible evidence of the provision of illegal gratuities to Daniel Faber represents a false record or statement to get false or fraudulent claims paid by the government.

90. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government. Each document or statement made, used, or caused to be made or used for this purpose is a false claim.

91. By virtue of the acts described above, Defendants other than Martin knowingly conspired with each other, and all Defendants conspired with Daniel Faber and the other public officials described above, to commit violations of 31 U.S.C. § 3729(a)(1)(A), (B), and (G).

92. Relator cannot at this time identify all of the false claims that were caused by Defendants' conduct. Documentation of such claims is in the possession of the government and the Defendants, and Relator has no access to such records.

93. The government, unaware of the falsity of the records, statements and claims made or caused to be made by the defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct and/or continues to provide the money requested or demanded from a government contractor or reimburse

the contractor for money that is requested or demanded, and failed and continues to fail to recover money and/or property due from Defendants to the government.

94. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## VII. PRAYER

WHEREFORE, Relator prays for judgment against the defendants as follows:

1. That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

2. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3. That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

4. That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5. That Relator recover such other relief as the Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, RELATOR HEREBY DEMANDS TRIAL BY JURY.

Dated: December 19, 2011

David S. Panzer (VSB # 43085)
GREENBERG TRAURIG, LLP
2101 L Street, N.W.
Suite 1000
Washington, D.C. 20037
Telephone: (202) 331-3100
Facsimile: (202) 331-3101
panzerd@gtlaw.com

*Counsel for Qui Tam Plaintiff/Relator William Jones*

OF COUNSEL:

C. Allen Foster
GREENBERG TRAURIG, LLP
2101 L Street, N.W.
Suite 1000
Washington, D.C. 20037
Telephone: (202) 331-3100
Facsimile: (202) 331-3101
fostera@gtlaw.com

Colette G. Matzzie
PHILLIPS & COHEN LLP
2000 Massachusetts Ave., N.W.
Washington, D.C. 20036
Telephone: (202) 833-4567
Facsimile: (202) 833-1815
cmatzzie@phillipsandcohen.com

Stephen Hasegawa
PHILLIPS & COHEN LLP
331 Steuart St., Suite 501
San Francisco, CA 94105
Telephone: (415) 836-9000
Facsimile: (415) 836-9001
ssh@pcsf.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 19th day of December, 2011, a true and correct copy of the foregoing Amended Complaint was served by first class mail, postage pre-paid; or by hand upon the parties noted below.

Counsel for the United States

Jocye R. Branda
Judith Rabinowitz
Robert McAuliffe
U.S. Department of Justice
Civil Division
P.O. Box 261
Washington, DC 20044
Tel: (202) 514-6832
Fax: (202) 514-0280
Robert.McAuliffe@usdoj.gov

and

Peter S. Hyun
Stephen Obermeier
Assistant U.S. Attorneys
Counsel for the United States
2100 Jamieson Ave.
Alexandria, VA 22314
Tel: (703) 299-3737
Fax: (703) 299-3983
Peter.Hyun@usdoj.gov

Colette G. Matzzie
Phillips and Cohen, LLP
2000 Massachusetts Ave., NW
Washington, DC 20036
Tel: (202) 833-4567
Fax: (202) 833-1815
CMatzzie@phillipsandcohen.com